In re ZAISAN, INC., Debtor.

ZAISAN, INC., Plaintiff,

v.

BRADEN CORNERSTONE PARTNER-
SHIP, LTD., and Walter H. Rankin,
Constable, Precinct No. 1, Harris Coun-
ty, Texas, Defendants,

A–1 Movemakers, Intervenor.

Bankruptcy No. 85–04292–H1–5.
Adv. No. 85–0634–H3.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Aug. 10, 1987.

Eric J. Taube and Edward L. Rothberg, Liddell, Sapp & Zivley, Houston, Tex., for Zaisan, Inc.

James Charles Fogo, Pasadena, Tex., for Braden Cornerstone.

Sandra K. Elzerman, Bonham, Carrington & Fox, Houston, Tex., for A-1 Movemakers, Inc.

Billy E. Lee, Co. Atty., Houston, Tex., for Constable Walter H. Rankin.

## MEMORANDUM OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration of the complaint to compel turnover, etc., filed by the debtor, Zaisan, Inc.; answers and affirmative defenses having been filed by the defendants, Braden Cornerstone Partnership, Ltd., and Walter H. Rankin, Constable, Precinct No. 1, Harris County, Texas; a motion to intervene having been filed by A-1 Movemakers in a state court proceeding, previously removed to this Court; all parties being represented by their respective attorneys of record; and the Court having heard and considered same, hereby finds as follows, to-wit:

### I.

The Court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (E), (K) and (O).

### II.

The parties to this proceeding are identified as follows:

Plaintiff/Debtor—Zaisan, Inc., hereinafter referred to as Zaisan.

Defendant—Braden Cornerstone Partnership, Ltd., hereinafter referred to as Braden or Braden Cornerstone.

Defendant—Walter H. Rankin, Constable, Precinct No. 1, Harris County, Texas, hereinafter referred to as Constable Rankin.

Intervenor—A-1 Movemakers, hereinafter referred to as A-1.

### III.

The factual underpinnings of this proceeding, using the most favorable terms available, could best be described as a "comedy of errors". The end result, on the other hand, will not evoke a very humorous reaction from most of the parties listed above. The decision process was much like a game of "Russian Roulette"—spin the

cylinder to determine which party or parties should bear the responsibility for the damages and costs that have accrued. Realistically speaking, however, the Court is less arbitrary than the spinning cylinder, and may consider, in a legal frame of reference, all of the factual circumstances that come into play. In an effort to provide a logical backdrop for this decision, a narrative analysis of the pertinent events is set forth below.

### IV.

This story unfolds with the initiation of a state court proceeding by Braden Cornerstone against Zaisan for the collection of delinquent rents. Braden Cornerstone had leased office space to Zaisan and was owed rent at that time in the approximate sum of $43,033.70. This amount is reflected on the distress warrant issued on June 11, 1985 by the Justice of the Peace, Precinct 4, Position 2, Harris County, Texas. At the request of Braden Cornerstone, Frank Davis, a deputy in the office of Constable Rankin, executed the distress warrant on property thought to be owned by Zaisan. The Constable's office secured the services of A-1 Movemakers to remove and store this property which consisted primarily of office furniture and equipment. Although Braden Cornerstone initially requested that the property be secured at its premises, the Constable was required by law to seize the property and store it in a bonded warehouse. Deputy Constable Davis and Otis Smith, the owner of A-1, met at the Braden Cornerstone building and were shown the Zaisan property by Jacqueline Bowman, an independent contractor employed by Braden Investment Company to provide liaison with the building's tenants. Based on conversations with Ms. Bowman, all of the office furniture and equipment was removed by A-1 from the leased office space occupied by Zaisan. The move took place over a three day period beginning on June 17, 1985, and concluded with the property being stored at the A-1 warehouse. Although no one was aware at the time,. only 25% to 30% of this property belonged to Zaisan. Most of the property had actually been leased by Zaisan from Equitable Life Leasing and Business Interiors, Inc. According to the testimony of James L. Dorris, the Zaisan representative, the value of the property owned by Zaisan, stored at the A-1 warehouse, was between $15,000.00 to $20,000.00. Both Equitable Life Leasing and Business Interiors, Inc., subsequently recovered possession of their property. A third leasing company, known only to the Court as S & L Leasing, recovered its property, which comprised only a small percentage of the total, from the A-1 warehouse in March, 1986.

On July 18, 1985, Zaisan filed its voluntary Chapter 11 petition for relief in this Court. On or about August 7, 1985, Zaisan made written demand for the return of its property from Constable Rankin and from Braden Cornerstone, but sent no correspondence to A-1. On August 13, 1985, Zaisan filed its complaint for turnover against Constable Rankin and Braden Cornerstone, but again did not name A-1 as a party to the litigation. According to the testimony of Mr. Smith, however, A-1 was aware of the Zaisan bankruptcy at this time since he had apparently read about the filing in a news story and had employed bankruptcy counsel to protect A-1's interest. Because of a severely congested docket, no action was taken on the Zaisan complaint for almost one year.

On April 16, 1986, Zaisan's plan of reorganization was confirmed in this Court, and contained a provision to pay Braden Cornerstone 5% of its allowed claim of $276,-377.90. Thereafter, on May 28, 1986, Braden Cornerstone sought to dissolve the distress warrant issued in the state court proceeding. On June 4, 1986, A-1 intervened in the state court case and sought to have the moving and storage expenses, which had accumulated to approximately $58,-650.00, assessed against either Braden Cornerstone or Zaisan. When confronted with the A-1 demand, Braden Cornerstone removed the state court proceeding to this Court on June 18, 1986. A-1 subsequently filed a motion to remand which, among other things, was considered by this Court on September 22, 1986. At the conclusion of that hearing, the Court held that the

removal was proper, and, to avoid duplicative litigation, decided that the matter should properly be tried in this Court. The Court also directed that the property remaining in the possession of A–1 be turned over to Zaisan, but preserved the possessory lien rights of A–1 regardless of the turnover.

## V.

The controversy in this case is focused now on who should bear the responsibility for the payment of the moving and storage charges allegedly owed to A–1. The total claim of A–1, as noted above in the sum of $58,650.00, is comprised of the following elements:

| | |
|---|---|
| Moving charges | $13,505.00 |
| Packing charges | 330.00 |
| Warehouse handling charges | 1,200.00 |
| Pre-petition storage charges (6/17/85—7/18/85) | 3,200.00 |
| Post-petition storage charges (7/19/85—8/13/85, date of Zaisan turnover complaint) | 2,600.00 |
| Balance of post-petition storage charges | 37,815.00 |
| Total | $58,650.00 |

## VI.

There are several factors that must be considered in resolving this dispute that relate to the conduct, or in some instances, the misconduct of the parties. The Court finds the following events to be significant:

(A) *Zaisan*—Obviously, Zaisan defaulted in its rent obligations owed to Braden Cornerstone. This fact triggered the sequence of events that led to the removal and storage of the office furniture and equipment by A–1. Zaisan did not demand turnover of the property from A–1 in its initial correspondence, nor did it name A–1 as a party defendant to the turnover complaint. Without question, these tactics delayed bringing all of the necessary parties promptly into one judicial forum.

Since Zaisan has now obtained confirmation of its plan of reorganization, which provides for the payment of approximately 5% of the rent claim of Braden Cornerstone in the total sum of $276,377.90, Zaisan would be considered the non-prevailing party in the rent litigation initiated by Braden Cornerstone. In this context, Rule 131, Texas Rules of Civil Procedure, provides that "The successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." Under ordinary circumstances, i.e., had this bankruptcy case not been commenced, Zaisan would have been taxed with the moving and storage costs, resulting from the issuance of the distress warrant, as a part of the costs of the state court proceeding. However, because the bankruptcy case was filed, federal law, particularly the provisions of the Bankruptcy Code, must be considered.

■ (B) *Constable Rankin*—Insofar as Constable Rankin is concerned, there are no provisions in the Bankruptcy Code that are in conflict with the Texas statutes or case law. § 7.003 of the Texas Civil Practice and Remedies Code provides the following:

§ 7.003. Liability Regarding Execution of Writs.

(a) Except as provided by Section 34.-061, an officer is not liable for damages resulting from the execution of a writ issued by a court of this state if the officer:

(1) in good faith executes the writ as provided by law and by the Texas Rules of Civil Procedure; and

(2) uses reasonable diligence in performing his official duties.

(b) An officer shall execute a writ issued by a court of this state without requiring that bond be posted for the indemnification of the officer.

This statute, coupled with the authority found in *Tierney v. Fraiser and Le Gierse and Co.*, 57 Tex. 432 (1882); *Henry S. Miller Company v. Sheriff Evans*, 452 S.W.2d 426 (Tex.1970) and *Rice v. Miller*, 70 Tex. 613, 8 S.W. 317 (1888); require that the complaint against Constable Rankin be dismissed.

(C) *Braden Cornerstone*—There is no serious question but that Braden Cornerstone was owed a substantial amount of rent by Zaisan. Braden Cornerstone, however, should have exercised more caution

prior to permitting the seizure of all of the property located on the Zaisan leased premises. Although no representative from Zaisan was present when the property was removed, and as such, no one was available to advise Constable Rankin, A–1, or Braden Cornerstone as to the exact ownership of the property, the Court was astonished to learn that almost 70% of the property removed did not belong to Zaisan.

Although this issue was not seriously litigated, the Court questions whether a stricter duty should be imposed on the party seeking the enforcement of a distress warrant, as well as, the moving company to more accurately ascertain the ownership of property prior to the levy of execution thereon. As noted above, Texas law places little or no duty upon the constable or any other lawful officer who normally is called on to execute writs such as the one in this case.

■ (D) *A–1 Movemakers*—As set forth hereinabove, A–1 must share part of the blame with Braden Cornerstone for removing property not belonging to Zaisan. This, however, is not the most serious problem confronting A–1. The testimony of A–1's owner, Otis Smith, convinces this Court that A–1 had knowledge of the Zaisan bankruptcy filing shortly after it occurred. This is verified by the fact that Smith either read or heard about the bankruptcy in a news story, which ordinarily would be published shortly after the filing. He also employed bankruptcy counsel to represent A–1 and received a billing reflecting services rendered during the month of August, 1985.

Perhaps more significantly is the fact that it is the policy of Constable Rankin's office to release the hold against property once the filing of a bankruptcy case is ascertained. According to the testimony of Deputy Constable Davis, the release of the hold against the property would customarily be communicated to the warehouseman.

A–1 never sought the permission of this Court to retain possession of the stored property pursuant to 11 U.S.C. § 543, which it has the right to do. Instead, A–1 unilaterally elected to retain possession of the property in an effort to gain leverage to insure the payment of its moving and storage charges. This is impermissible under the Bankruptcy Code and A–1 must now suffer the consequences for which it is largely responsible. Had A–1 returned the property to the debtor with the preservation of its lien rights as was done on September 22, 1986, the accumulation of storage charges would have been quickly terminated. The Court is of the opinion that this could have been realistically accomplished on or before the date that Zaisan filed its complaint for turnover. Consequently, the Court will disallow all storage charges that accrued subsequent to August 13, 1985.

■ In this same context, the Court is of the opinion that all attorneys' fees for which A–1 seeks reimbursement were incurred subsequent to the time that the property should have been turned over to Zaisan. These attorneys' fees were also incurred as a result of impermissible conduct under the Bankruptcy Code, i.e., the wrongful withholding of property that should have been released to the debtor. As such, no attorneys' fees will be awarded to A–1 as a result of this proceeding. The entire claim of A–1, however, shall not be disallowed, but it shall be determined and assessed hereinbelow.

VII.

■ Pursuant to § 7.209(a) of the Texas Business and Commercial Code, A–1 would ordinarily have a possessory lien encumbering the property owned by Zaisan for the moving and storage charges. This section is set forth as follows:

§ 7.209. Lien of Warehouseman

(a)(1) A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of

the goods or reasonably incurred in their sale pursuant to law.

(2) If the person on whose account the goods are held is liable for like charges or expenses in relation to other goods whenever deposited and it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods, the warehouseman also has a lien against him for such charges and expenses whether or not the other goods have been delivered by the warehouseman. But against a person to whom a negotiable warehouse receipt is duly negotiated a warehouseman's lien is limited to charges in an amount or at a rate specified on the receipt or if no charges are so specified then to a reasonable charge for storage of the goods covered by the receipt subsequent to the date of the receipt.

(b) The warehouseman may also reserve a security interest against the bailor for a maximum amount specified on the receipt for charges other than those specified in Subsection (a), such as for money advanced and interest. Such a security interest is governed by the chapter on Secured Transactions (Chapter 9).

(c) A warehouseman's lien for a security interest under Subsection (b) is effective against any person who so entrusted the bailor with possession of the goods that a pledge of them by him to a good faith purchaser for value would have been valid but is not effective against a person as to whom the document confers no right in the goods covered by it under Section 7.503. However, the warehouseman's specific lien for charges and expenses under Subsection (a)(1) is effective against any security interest. If the warehouseman learns of a perfected security interest owned by a person as to whom the document confers no right in the goods covered by it under Section 7.503 against the goods and fails thereafter to give such secured party (Section 9.105) written notice of the accrued and unpaid charges and expenses at the time when they have accrued for between two and six months, then the warehouseman's specific lien under Subsection (a)(1) is effective as against such secured party only with respect to unpaid charges and expenses which have accrued by the end of six months.

(d) A warehouseman loses his lien on any goods which he voluntarily delivers or which he unjustifiably refuses to deliver.

The Court is aware that although the Zaisan property has now been released by A–1, the Court preserved the A–1 lien as if possession were retained. As noted above, the testimony established that the value of the Zaisan property was in the range of $15,000.00 to $20,000.00.

Clearly, storage charges are identical to charges for rented space. As such, the Court is of the opinion that the statutory lien provided by virtue of the above quoted section, i.e., § 7.209, Texas Business and Commercial Code, as to the storage charges can be avoided pursuant to 11 U.S.C. § 545(3). On the other hand, the statutory lien cannot be avoided as to the moving, handling, and labor charges. The potential secured claim of A–1 is set forth as follows:

| | |
|---|---|
| Moving charges | $13,505.00 |
| Packing charges | 330.00 |
| Warehouse handling charges | 1,200.00 |
| Total: Moving and handling charges | $15,035.00 |

If the value of the stored property owned by Zaisan, not Equitable Life Leasing, Business Interiors, Inc., etc., meets or exceeds the sum of $15,035.00, A–1 would be entitled to a secured claim for this amount. Since this figure exceeds the low figure quoted by Mr. Dorris by only $35.00, the Court would presume that the claim for moving and handling charges would be fully secured. If this is, in fact, the case, Zaisan must modify its confirmed plan of reorganization and provide treatment for this secured claim according to law.

## VIII.

As pointed out hereinabove, the Court has set a cutoff date for the accrual of storage charges as August 13, 1985, the date that Zaisan filed its complaint for

turnover. Although A–1 was not made a party defendant to this complaint, the Court is of the opinion that this is a reasonable date to terminate the accrual of storage charges primarily because the Court is convinced that A–1 had actual notice of the Zaisan bankruptcy at that time, as well as, that A–1 had been advised by the office of Constable Rankin that the hold on the Zaisan property was being released. Since storage charges did accrue between June 17, 1985 and August 13, 1985, the Court must address these charges separately. In discussing these charges, the Court makes the assumption that Zaisan will by appropriate complaint avoid any statutory lien for rents, as discussed above, pursuant to 11 U.S.C. § 545(3). In this context, the Court observes that storage charges accrued in the sum of $3,200.00 pre-petition, i.e., between June 17, 1985 and July 18, 1985, and that storage charges, as allowed, accrued in the sum of $2,600.00 post-petition, i.e., between July 19, 1985 and August 13, 1985. It is, therefore, the opinion of this Court that A–1 would hold an allowed unsecured claim for the pre-petition charges in the sum of $3,200.00, but would hold an administrative expense claim pursuant to 11 U.S.C. § 503(b)(1)(A), for post-petition charges in the sum of $2,600.00. Again, because of these findings, Zaisan must amend its confirmed plan of reorganization to provide treatment for these claims accordingly.

A recap of the Court's findings, considering the assumptions made, appears as follows:

| | |
|---|---|
| A–1's allowed secured claim | $15,035.00 |
| A–1's allowed unsecured claim | 3,200.00 |
| A–1's administrative expense claim | 2,600.00 |
| Total claims allowed | $20,835.00 |

## IX.

Zaisan is directed to modify its confirmed plan of reorganization in keeping with this Opinion within twenty days of the date hereof. The total amount of compensation awarded to A–1 is $20,835.00. From the Court's perspective, it appears that most of the claims can be paid through a modified plan. The Court is aware, however, having seen the treatment of the Braden Cornerstone claim in the Zaisan plan, that a substantial portion of the unsecured claim will not be paid. Therefore, pursuant to Rules 125 and 127, Texas Rules of Civil Procedure, should any portion of the allowed unsecured claim not be paid to A–1 by Zaisan through its modified plan of reorganization, then the responsibility for the payment of such claim shall fall back to Braden Cornerstone. This relation back to Braden Cornerstone shall also be applicable to other parts of the allowed A–1 claims in the event that Zaisan is unable to obtain confirmation of the modified plan mandated by this Opinion, and is compelled to convert or dismiss this bankruptcy case.

## X.

Having now addressed the claims of each of the parties involved in this proceeding, the Court is of the opinion that the motion to abstain advanced by Zaisan is not well taken and is hereby overruled.

An Order will be entered consistent with this Opinion.