In the Matter of GREAT NORTHERN FOREST PRODUCTS, INC., Debtor.

James W. BOYD, Trustee, Plaintiff,

v.

DOCK'S CORNER ASSOCIATES, a New Jersey Limited Partnership, Defendant and Counter–Plaintiff and Third–Party Plaintiff,

v.

James W. BOYD, Trustee, Counter–Defendant,

and

Old Kent Bank–Southwest, Third–Party Defendant.

Bankruptcy No. GK 89–04489.
Adv. No. 90–8250.

United States Bankruptcy Court, W.D. Michigan.

Dec. 20, 1991.

James Vantine, Kalamazoo, Mich., for trustee James W. Boyd.

Richard Shapiro and James A. Engbers, Grand Rapids, Mich., for Dock's Corner Associates.

Scott Hogan, Grand Rapids, Mich., for Old Kent Bank–Southwest.

## OPINION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

JAMES D. GREGG, Bankruptcy Judge.

### I. ISSUES

The cross motions for summary judgment in this adversary proceeding raise four major issues: First, does a landlord hold a valid lien on personal property stored on its real property and, if so, is the lien avoidable? Second, is the Debtor responsible to remedy alleged pollution on the landlord's real property under New Jersey and federal environmental laws? Third, are any of the landlord's asserted unpaid rents, use and possession charges, or environmental clean up costs entitled to administrative priority pursuant to 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1)? [1] Fourth, may any rents, use and possession charges, or environmental clean up costs be recovered by the landlord from the proceeds of the sale of a secured creditor's personal property collateral pursuant to § 506(c)?

### II. PROCEDURAL BACKGROUND

Great Northern Forest Products, Inc. (herein "Debtor") filed its petition for relief under chapter 11 of the Bankruptcy Code on December 6, 1989. The proceeding was soon converted to a chapter 7 case on December 15, 1989. Gerald L. Barefield (herein "Trustee") was appointed as the chapter 7 Trustee on the conversion date.[2]

Old Kent Bank–Southwest (herein "Bank") filed its Proof of Claim on December 20, 1989, in the amount of $2,825,-033.10. The Bank's claim is secured by a perfected security interest in the Debtor's assets including machinery, equipment, in-

---

1. Unless otherwise noted, all future statutory references are to Title 11 of the United States Code, sometimes referred to as the "Bankruptcy Code" or "Code".

2. James W. Boyd was appointed successor trustee for the Debtor's chapter 7 estate. On July 12,

1991 the successor trustee was substituted as plaintiff in this adversary proceeding. *See* FED. R.BANKR.P. 2012 and 7025. The caption has therefore been amended to designate James W. Boyd as the proper party plaintiff.

ventory and other personalty. The Trustee has not objected to the amount of the Bank's claim or the validity or perfection of its security interest. The Bank holds no mortgage on the Debtor's or Dock's Corner Associates' (herein "Dock's Corner") real property.

On January 31, 1990, counsel for the Trustee received a letter from counsel for Dock's Corner indicating it would assert a landlord's lien on all items of equipment, inventory, and personal property located at 167–169 Dock's Corner Road, South Brunswick, Middlesex County, New Jersey (herein the "Premises"). By correspondence dated February 2 and 12, 1990, counsel for the Trustee requested return from Dock's Corner of the personal property that was the subject of the alleged landlord's lien. Dock's Corner did not respond to these letters.

On April 23, 1990, after notice and a hearing, this court entered an order approving the sale of certain of the Debtor's personal property assets. The sale included treated wood inventory (Lot 3) located at the Premises. The wood inventory was sold to Sherwood Lumber Corporation of Islandic, New York, for the sum of $185 per 1000 board feet. The proceeds from Lot 3 totaled $138,409.50.

The sale order provided: (1) the property was sold free and clear of all liens or encumbrances with claims attaching to the proceeds in the same order of rank, validity, and priority as existed before the sale, (2) expenses of custody, protection and insurance of the property sold, including legal expenses of the Trustee, would be charged against the sale proceeds under § 506(c), and (3) the proceeds from the sale would be escrowed until the validity of Dock's Corner's asserted landlord's lien was determined by the court. The sale order was not appealed by any party in interest.

On May 15, 1990, the Trustee abandoned all other personal property of the Debtor located at the Premises. No objection to this abandonment was filed by any party in interest. The abandonment order became final on June 17, 1990. No appeal was filed with regard to the abandonment order.

On June 18, 1990, the Trustee filed a Complaint for Invalidation of Alleged Landlord's Lien against Dock's Corner (herein "Trustee's Complaint"). The Trustee requests the court to determine the Debtor was not a tenant of Dock's Corner and therefore, under New Jersey law, a lien may not attach against the Debtor's personal property. Alternatively, to the extent the Debtor owed Dock's Corner any obligation which might be subject to a landlord's lien, it is requested that any such lien be deemed avoided pursuant to § 545(3) and (4).

On September 20, 1990, Dock's Corner filed its Answer, Counterclaim, and Third Party Complaint to the Trustee's Complaint (herein "Dock's Corner's Answer", "Counterclaim" or "Third Party Complaint"). Dock's Corner admitted all factual allegations alleged in the Trustee's Complaint except it denied that its asserted landlord's lien was invalid or voidable. In its Counterclaim and Third Party Complaint, Dock's Corner asserts: (1) it has a statutory lien for unpaid rent for a period of not more than six months; (2) the Debtor, as tenant, has a responsibility to clean up the Premises under the New Jersey Environmental Cleanup Responsibility Act and other New Jersey and federal environmental statutes; (3) that any environmental clean up costs are entitled to administrative expense priority and must be paid by the Debtor's estate; and (4) that all unpaid rent subject to the landlord's lien and all asserted clean up costs may be recovered from the sale proceeds of the Bank's personal property collateral under § 506(c).

On October 20, 1990, the Trustee answered the Counterclaim (herein "Trustee's Answer"). The Trustee asserts three affirmative defenses. First, the Debtor was not a party to any written or oral lease with Dock's Corner. Since Debtor did not rent the Premises and is not a lessee pursuant to a lease, Dock's Corner is not entitled to a statutory lien for unpaid rent. Even assuming there is a lease agreement between the Debtor and Dock's Corner, any statu-

tory lien is avoidable pursuant to § 545. Second, the Trustee is not responsible for compliance with the environmental statutes and any potential costs for compliance do not take priority over the Bank's secured claim. Third, Dock's Corner does not qualify for administrative priority and its requested surcharge pursuant to § 506(c) is not proper.[3]

On October 26, 1990, the Bank answered the Third Party Complaint (herein "Bank's Answer"). The Bank's affirmative defenses are the same as the Trustee except the Bank asserts that Dock's Corner lacks standing to bring an action pursuant to § 506(c) and, even assuming standing exists, Dock's Corner has failed to state a valid claim under the statute.

The court has jurisdiction over this adversary proceeding. 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O), and the court has the authority to enter a final judgment or order.[4]

3. The Trustee also asserts the Counterclaim fails to state a claim upon which relief can be granted, Dock's Corner has failed to mitigate damages, and this action is barred by waiver and estoppel.

4. In its Counterclaim and Third Party Complaint, Dock's Corner has requested that this court make a determination regarding obligations that may be owed to it by Arnox Corporation (herein "Arnox"), the parent of the Debtor. Arnox has filed for relief in the United States Bankruptcy Court for the District of New Jersey, Case No. 89–07155. This bankruptcy court has no jurisdiction over the Arnox case. To the extent relief is requested by Dock's Corner against Arnox or its estate, such relief should be sought by filing an appropriate pleading in the New Jersey Bankruptcy Court.

5. The record before the court consists of all pleadings submitted by the parties including the exhibits attached thereto; Answers to Interrogatories Propounded by Old Kent Bank–Southwest dated January 4, 1991; Old Kent Bank–Southwest's First Request for Admissions dated January 31, 1991; Affidavit of John DuMond dated November 22, 1989; Affidavit of David R. Biek dated March 28, 1991; Affidavit of Michael Stolz dated April 4, 1991; Affidavit of Lawrence S. Berger dated July 30, 1991; Affidavit of Gerald L. Barefield dated August 21, 1991; and, Affidavit of David R. Biek dated August 23, 1991.

## III. FACTS

The facts in this case are relatively simple. Based upon the court's review of the record, the following facts are uncontested.[5] The Debtor is a Delaware corporation with its principal place of business in Michigan. Arnox is also a Delaware corporation and owns 100% of the stock of the Debtor. (Trustee's Complaint at 2; Dock's Corner's Answer at 2.) Dock's Corner is a New Jersey limited partnership and the owner of industrial property located at 167–169 Dock's Corner Road, South Brunswick, Middlesex County, New Jersey. (Dock's Corner's Answer at 4; Trustee's Complaint at 2.) Arnox leased a portion of the Premises from Dock's Corner pursuant to a written lease.[6] (Trustee's Complaint at 2; Dock's Corner's Answer at 2.)

Although no written or oral lease existed between Dock's Corner and the Debtor, and no written sublease or assignment existed between Arnox and the Debtor, Arnox permitted the Debtor to use a portion of the Premises.[7] (Trustee's Com-

6. Arnox actually leased the Premises before Dock's Corner acquired an ownership interest in the property. On April 12, 1979, a lease was executed between Phillips Dodge Industries (lessor) and Uniroyal (lessee) for the Premises. Phillips Dodge Industries sold its interest in the Premises to GSL Enterprises on July 7, 1984. Uniroyal entered into a sublease with Arnox on November 15, 1984. Then, on May 30, 1985, GSL Enterprises purchased Uniroyal's interest in the lease creating a direct lessor/lessee relationship between GSL Enterprises and Arnox. On June 16, 1988, Dock's Corner's general partner purchased the Premises from GSL Enterprises, therefore creating a lessor/lessee relationship between Dock's Corner and Arnox. (*See* Exhibits A, B, & C of Dock's Corner's Memorandum of Law in Support of its Cross–Motion for Summary Judgment.)

7. Dock's Corner admitted in its Answer that no written lease existed between it and the Debtor. Additionally, the Bank, in its First Request for Admissions, requested Dock's Corner to admit that it never entered into an oral lease with the Debtor concerning the Premises. (*See* Exhibit 1 of Brief in Support of Old Kent Bank–Southwest's and the Trustee's Motion for Summary Judgment.) Dock's Corner failed to timely respond; therefore, the request is admitted. *See* FED.R.CIV.P. 36(a); FED.R.BANKR.P. 7036(a).

plaint at 2; Dock's Corner's Answer at 2; Affidavit of David R. Biek dated March 28, 1991.) Both the Debtor and Arnox were in the business of treating lumber and used the Premises for this purpose.[8] (Counterclaim at 6; Trustee's Answer at 3; Bank's Answer at 3.) Dock's Corner asserts that the Debtor and/or Arnox caused environmental damage to the Premises through their process of treating wood.

On April 23, 1990, the court confirmed a sale of virtually all of the Debtor's assets, including certain treated wood inventory, located on the Premises. The Bank holds valid and perfected security interests in all equipment, inventory, and personal property of the Debtor which was stored at the Premises, including the treated wood inventory sold on April 23, 1990. (Third Party Complaint at 6; Trustee's Answer at 3; Bank's Answer at 6; Affidavit of Michael Stolz dated April 4, 1991.) The court ordered the Trustee to hold the proceeds from the sale of the wood inventory until the validity of the alleged landlord's lien was determined. (Exhibit 2 of Brief in Support of Old Kent Bank–Southwest's and the Trustee's Motion for Summary Judgment.) Subsequently, on May 15, 1990, the Trustee abandoned the remaining assets located upon the Premises per order of this court. (Exhibit 3 of Brief in Support of Old Kent Bank–Southwest's and the Trustee's Motion for Summary Judgment.)

## IV. DISCUSSION

### A. *Standards to Grant or Deny Motions for Summary Judgment*

■ In considering the cross motions for summary judgment, this court is guided by the standards set forth by Judge Gibson in *FMB–First Michigan Bank v. Van Rhee*, 681 F.Supp. 1264, 1266 (W.D.Mich.1987), wherein it is stated:

> Summary judgment is appropriate only where no genuine issue of material fact remains to be decided and the moving party is entitled to judgment as a matter of law. *Atlas Concrete Pipe, Inc. v.*

*Roger J. Au & Son, Inc.*, 668 F.2d 905, 908 (6th Cir.1982), *see Willetts v. Ford Motor Co.*, 583 F.2d 852, 854 (6th Cir. 1978); *Felix v. Young*, 536 F.2d 1126, 1130 (6th Cir.1976). The function of a motion for summary judgment is not to allow the court to decide issues of fact but rather to determine whether there is an issue of fact to be tried. *United States v. Articles of Device, Etc.*, 527 F.2d 1008, 1011 (6th Cir.1976); *Aetna Ins. Co. v. Cooper Wells & Co.*, 234 F.2d 342, 345 (6th Cir.1956). The moving party bears the burden of clearly establishing the non-existence of any genuine issue of fact material to a judgment in his favor. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Articles*, 527 F.2d at 1011. In determining whether there are genuine issues of fact warranting a trial, the evidence will be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir.1962). If a disputed question of material fact remains, the motion for summary judgment must be denied. *Atlas*, 668 F.2d at 908; *Felix*, 536 F.2d at 1030; *Bohn*, 303 F.2d at 427.

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court analyzed the requirements necessary to grant a motion for summary judgment, specifically focusing on what constitutes a *"genuine* issue of *material* fact." *Id.* at 248, 106 S.Ct. at 2510 (emphasis in original). In determining whether a fact is "material," the Court stated:

> As to materiality, the *substantive law* will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual

---

8. Arnox also held a license for the sale of the fire retardant chemicals used to treat the lumber. The Debtor purchased these chemicals from Arnox. (*See* Memorandum of Law in Support of Trustee's Motion for Summary Judgment at 1.)

disputes that are irrelevant or unnecessary will not be counted.

*Id.* (emphasis added). A material fact is "genuine" if a reasonable fact-finder, in assessing the evidence, could possibly return a verdict for the nonmoving party. *Id.; Bohm v. Forum Resorts, Inc.,* 762 F.Supp. 705, 707 (E.D.Mich.1991); *Hoffman v. Roberto,* 85 B.R. 406, 409 (W.D.Mich.1987). The Court further noted:

> [I]t is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.... [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.
>
> ... The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

In order to grant a summary judgment, the court must examine all facts established by the record before it and conclude that, under the applicable substantive law, no reasonable fact-finder could possibly return a verdict in favor of the nonmoving party. Under such circumstances, no genuine issue of material fact exists and a grant of summary judgment is appropriate.

**B.** *Validity of Landlord's Lien*

 Dock's Corner claims it holds a valid landlord's lien, under New Jersey law, upon the Debtor's equipment, inventory, and personal property which were used or stored on the Premises. *See* N.J.Stat.Ann. § 2A:44–166. The Trustee and Bank assert that there is no lease, sublease, or assignment between the parties; therefore, the

New Jersey statute is inapplicable. Even if it were, the Trustee argues he may avoid the statutory lien pursuant to § 545.

N.J.Stat.Ann. § 2A:44–166 provides:

> A rentor shall be entitled to a lien on machinery and other chattels to the extent of the rentee's interest therein for the amount of unpaid rent, from the date the rent is unpaid.
>
> Such lien hereby created shall have priority and be paramount to any title, lien, interest, mortgage, judgment or other encumbrance created or acquired after machinery or other chattels are placed in the premises. Such priority shall extend only to the amount of unpaid rent for not more than 6 months.

"Rentor" is defined by the statute as a person, partnership, or corporation that rents to another for manufacturing or other purposes. *Id.* § 2A:44–165. A "rentee" is a person, partnership, or corporation that rents space for manufacturing or other purposes. *Id.* The language of the statute is clear. For the statute to apply, there must be a relationship between a rentor and rentee entitling the rentor to a payment of rent. There must be a landlord/tenant relationship whether it be by lease, sublease, or assignment.

**1. Implied or Constructive Lease**

Although no written or oral lease exists, Dock's Corner asserts that the court should imply a lease between itself and the Debtor. Even though there is no express lease between itself and the Debtor, it is argued the conduct of the parties establishes a lease relationship. Such an argument is premised upon correspondence between the parties showing the Debtor made rent payments to Dock's Corner on behalf of Arnox. (*See* Exhibits D & R of Dock's Corner's Memorandum of Law in Support of its Cross–Motion for Summary Judgment; Exhibits 2 & 3 of Memorandum of Law in Support of Trustee's Motion for Summary Judgment.)

 The relationship of landlord and tenant is created by express or implied contract. A lease will not be implied where the conduct of the parties is contrary to its

existence. *See* 49 AM.JUR.2D *Landlord and Tenant* § 11 (1970) (citing *Wiggins Ferry Co. v. Ohio & M.R. Co*, 142 U.S. 396, 406, 12 S.Ct. 188, 35 L.Ed. 1055 (1892)).

New Jersey courts have analyzed constructive or implied leases.[9] Generally, a lease exists when there is an agreement by the lessor to turn over specific premises to the exclusive possession of a lessee for a definite time period. In return, the lessor receives a payment of rent from the lessee. *Thiokol Chem. Corp. v. Morris County Bd. of Taxation*, 41 N.J. 405, 197 A.2d 176, 182 (1964). "Frequently, a lease is spoken of as a hiring of land, or a sale of the possession, occupancy and profits of land for a term." *Id*. Whether a lease exists depends on the intention of the parties as expressed by a written document or the conduct of the parties to the alleged lease. *Id*. Where the intentions of the parties is unclear, the burden is on the party asserting the existence of a lease to demonstrate a landlord-tenant relationship. *Id.; Town of Kearny v. Municipal Sanitary Landfill Auth.*, 143 N.J.Super. 449, 363 A.2d 390, 393–94 (1976); *Outerbridge Terminal, Inc. v. City of Perth Amboy*, 179 N.J.Super. 400, 432 A.2d 141, 144 (1980).

It is impossible for the court to examine a document to determine the intentions of the parties because no document exists. The conduct of the parties is therefore paramount. Dock's Corner has the burden to show the existence of a lease.

It is undisputed that the Debtor used a portion of the Premises for business operations and Dock's Corner received checks from the Debtor for rent. (*See* Exhibit D of Dock's Corner's Memorandum of Law in Support of its Cross–Motion for Summary Judgment.) In a letter dated July 27, 1988 from Dock's Corner's counsel to Debtor's counsel (herein the "Letter"), Dock's Corner acknowledges that the Debt-

or "processed" rent payments for Arnox, its parent corporation. The Debtor also processed checks for Arnox's other subsidiaries and related entities to streamline administration. (*See* Memorandum of Law in Support of Trustee's Motion for Summary Judgment at 2 n. 2.) The Debtor merely processed the checks for rent on behalf of its parent corporation, Arnox, and was not the lessee under the lease. The Letter explicitly stated Arnox was the tenant of the lease. (*See* Exhibits 2 & 3 of Memorandum of Law in Support of Trustee's Motion for Summary Judgment.) The Letter indicates Dock's Corner never considered the Debtor a tenant of the Premises and actually considered Arnox as the sole party to the lease.

Dock's Corner completely ignored and failed to join the Debtor in its prepetition attempts to obtain unpaid rent and regain possession of the Premises from Arnox in state court. (*See* Exhibit 4 of Memorandum of Law in Support of Trustee's Motion for Summary Judgment; Exhibit E of Dock's Corner's Memorandum of Law in Support of its Cross–Motion for Summary Judgment.) *All* of Dock's Corner's *efforts* to regain possession and unpaid rent were directed at Arnox as tenant of the leased Premises. The Debtor was never named as a tenant or cotenant of the Premises in the proceeding. These prior actions are peculiar; if Dock's Corner believed it had a landlord's relationship with the Debtor, it would have been asserted earlier.

Dock's Corner's assertion a lease exists is inconsistent with its previous conduct. Its current legal position appears to be an after thought. Dock's Corner never intended for a lease to exist between itself and the Debtor. The lack of a written document and the parties' conduct indicate that a lease did not exist between the parties and their relationship was never con-

---

**9.** Although the New Jersey courts have analyzed implication of leases, the courts generally have examined the issue in determining whether a particular document and actions of a party establish a lease. *See Thiokol Chem. Corp. v. Morris County Bd. of Taxation*, 41 N.J. 405, 197 A.2d 176 (1964); *Town of Kearny v. Municipal Sanitary Landfill Auth.*, 143 N.J.Super. 449, 363 A.2d 390 (1976); *Outerbridge Terminal, Inc. v. City of Perth Amboy*, 179 N.J.Super. 400, 432 A.2d 141 (1980). The court has been unable to locate any case factually similar to this case, i.e., where no written or oral agreement of any kind existed between the parties and a lease was implied *solely* relying on the actions of the parties.

ducted in a manner as lessor and lessee. This court so holds. Arnox simply allowed its wholly owned subsidiary to use a portion of the Premises.

### 2. Implied or Constructive Assignment

As its fall back position, Dock's Corner proposes an equally unconvincing theory, i.e., there was an implied assignment of the lease between Arnox and Dock's Corner to the Debtor. Dock's Corner again relies on the Letter. It asserts the Letter indicates that "perhaps" Arnox assigned its leases to the Debtor. (*See* Dock's Corner's Memorandum of Law in Support of its Cross-Motion for Summary Judgment at 21.)

Where a party other than the lessee is found to be in possession of the leased premises, a rebuttable presumption arises that an assignment of the lease has occurred. 51C C.J.S. *Landlord & Tenant* § 37(3) (1968); *Spear v. Lyndale Mfg. Co.,* 35 N.J.Super. 385, 114 A.2d 314, 316 (1955). The presumption is rebutted where, in view of the Statute of Frauds requirement that an assignment be in writing, there is no written agreement for assignment between the parties. *Donsky v. Sedlak,* 4 N.J.Misc. 49, 131 A. 619, 619 (1926); *Spear,* 114 A.2d at 316. Another bankruptcy court has also analyzed the issue of implied or constructive assignments. In *In re F.A.M.I. Serv. Sys.,* 19 B.R. 30 (Bankr.S.D.Fla.1982), the court recognized that constructive or implied assignments are a well-founded legal principal. *Id.* at 32. That court also ruled that an important element in determining whether an assignment occurred is knowledge of the parties. *Id.* at 33.

The New Jersey Statute of Frauds provides, in pertinent part:

> No lease, estate or interest ... shall be *assigned,* granted or surrendered, *unless it be* by deed or note *in writing, signed by the party so assigning,* granting or surrendering the same....

N.J.Stat.Ann. § 25:1–2 (emphasis added). By the express language of the statute, there is no assignment of lease in this case because there is no signed writing or any direct evidence of an assignment.[10] (*See* Affidavit of David R. Biek dated March 28, 1991.) The Letter makes no reference to any assignment between the Debtor and Arnox. The words "assignment" or "assign" are not mentioned in the Letter. Even considering a bankruptcy court's broad equitable powers, to hold an assignment of lease existed based on the Letter and the Debtor processing Arnox's rent payments would be insupportable and erroneous. Neither Dock's Corner, Arnox, nor the Debtor had any knowledge of an assignment or any other agreement which would extend the lease for the benefit of the Debtor. No assignment occurred—the parties simply acted as if Arnox was a tenant who allowed its wholly owned subsidiary to use the Premises.

As a matter of law, this court holds: (1) there is no express or implied lease between the Debtor and Dock's Corner; (2) there is no express or implied assignment of lease between Arnox and the Debtor; (3) a landlord's lien does not exist pursuant to N.J.Stat.Ann. § 2A:44–166; and, (4) a rentor-rentee relationship obligating the Debtor to pay rent to Dock's Corner does not exist.

Even assuming *arguendo* that, (1) a rentor-rentee relationship exists, (2) the Debtor owes Dock's Corner rent, and (3) Dock's Corner holds a valid landlord's lien, Dock's Corner still loses. Any such landlord's lien is avoidable and would be avoided per § 545(3) and (4). Under such circumstances, Dock's Corner would be relegated to the holder of a general non-priority unsecured claim.[11]

---

**10.** In an attempt to avoid the Statute of Frauds requirement, Dock's Corner asserts that the Letter and the fact the Debtor processed rent payments for Arnox may be taken together to constitute a valid oral assignment of lease of a term less than three years. *See* N.J.Stat.Ann. § 25:1–1. The court does not find this argument compelling; it is almost bogus. The actual lease has a term much longer than three years and the Letter can *not* be interpreted as an assignment of lease whether written or oral.

**11.** If Dock's Corner holds an allowed unsecured claim, this will make no economic difference to it. Based upon its files, the court finds it is

C. *Liability for Cost of Compliance with New Jersey and Federal Environmental Statutes*

 Dock's Corner alleges that the Debtor's termination of its wood treatment operations has resulted in liability for compliance with provisions of the Environmental Cleanup Responsibility Act (herein "ECRA"), N.J.Stat.Ann. §§ 13:1K–6 to 13:1K–32; the Spill Compensation and Control Act, N.J.Stat.Ann. §§ 58:10–23.11 to 58:10–23.11z [12]; and, the Comprehensive Environmental Response Compensation and Liability Act (herein "CERCLA"), 42 U.S.C. §§ 9601–9675.[13]

 CERCLA mandates a comprehensive response and financing program to abate problems arising from hazardous waste sites. *Dery v. Becker (In re Sterling Steel Treating, Inc.)*, 94 B.R. 924, 927 (Bankr.E.D.Mich.1989). It allows private parties to voluntarily clean up hazardous waste sites and to recover their costs from potentially responsible parties. *Id.* CERCLA establishes liability as follows:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... shall be liable for,

....

(A) all costs of removal or remedial action incurred by the United States Government or a State ... not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such release; ...

42 U.S.C. § 9607(a). A person is entitled to seek contribution from any potentially responsible party under CERCLA. *Id.* § 9613(f)(1). CERCLA imposes strict liability upon culpable parties. *See Sterling Steel*, 94 B.R. at 928; *In re T.P. Long Chem., Inc.*, 45 B.R. 278, 282 (Bankr. N.D.Ohio 1985).

ECRA considers the liability of persons for clean up of hazardous waste when an industrial establishment is transferred, sold, or ceases operations. *See* N.J.Stat. Ann. §§ 13:1K–7 & 13:1K–9. Specifically, ECRA requires an owner or operator of an industrial establishment planning to cease operations to notify the New Jersey Department of Environmental Protection (herein "DEP") of the cessation and to submit a clean up plan and surety bond for approval. *Id.* § 13:1K–9(a). If the owner or operator plans to sell or transfer the industrial establishment, the DEP must be notified and the owner or operator must also submit a clean up plan and surety bond for approval. *Id.* § 13:1K–9(b). Like CERCLA, ECRA also imposes strict liability for an owner or operator who must

---

extremely unlikely that any distribution will be made to general unsecured creditors. FED. R.EVID. 201.

**12.** There is no private right of action under the Spill Compensation and Control Act. *See* N.J.Stat.Ann. § 58:10–23.11b. Therefore, the court will not consider the estate's possible liability to Dock's Corner under this Act.

**13.** In its Counterclaim, Dock's Corner also asserts that the estate may be liable pursuant to the Federal Conservation Act, 42 U.S.C. §§ 6901–6992k; the Water Pollution Control Act, N.J.Stat.Ann. §§ 58:10A–1 to 58:10A–56; and the Hazardous Substance Discharge Reports and Notices Act, N.J.Stat.Ann. §§ 13:1K–

15 to 13:1K–32. Since Dock's Corner did not argue liability under these environmental statutes at oral argument or in its briefs, the court will limit its focus to those statutes raised in the memoranda of law and oral argument.

Additionally, Dock's Corner asserts the Debtor and Trustee violated the "environmental laws" provisions of the Arnox/Dock's Corner lease. In accordance with its prior ruling that no lease existed between Dock's Corner and the Debtor, and no assignment existed between Arnox and the Debtor, the Trustee and Debtor are not liable for environmental compliance pursuant to the lease.

58

comply with the statute. *See* N.J.Stat.Ann. §§ 13:1K–13 & 58:10–23.11g.

Under ECRA, the filing of a bankruptcy petition is one of the events which constitutes "closing, terminating, or transferring operations", therefore triggering possible liability. N.J.Stat.Ann. § 13:1K–8(b). In *Torwico Elec., Inc. v. New Jersey Dep't of Envtl. Protection (In re Torwico Elec., Inc.)*, 131 B.R. 561 (Bankr.D.N.J.1991), this ECRA provision and other provisions related to bankruptcy were held void under the Supremacy Clause to the extent they dictated treatment of clean up obligations in bankruptcy cases. *Id.* at 574–76. This court agrees with the analysis in *Torwico Elec.* Therefore, the filing of a bankruptcy petition by the Debtor did not trigger liability pursuant to ECRA.

 In considering a motion for summary judgment, the court may not resolve issues of fact, but rather must decide if issues of fact exist. *Articles of Device, Etc.*, 527 F.2d at 1011; *Cooper Wells & Co.*, 234 F.2d at 345. If, under the applicable substantive law, a reasonable fact-finder could decide in favor of the nonmoving party, genuine issues of material fact exist. *Anderson*, 477 U.S. at 248–51, 106 S.Ct. at 2510–11. The court finds that genuine issues of material fact exist regarding the potential liability of the Debtor or Trustee to Dock's Corner for expenses to comply with environmental statutes. The unknown or contested facts include: (1) the existence of any alleged environmental damage to the property, if any; (2) what and whom caused any alleged environmental damage; (3) whether any alleged environmental damage occurred prepetition, postpetition, or both; and, (4) whether Trustee or Debtor "operated" the facility postpetition and caused environmental damage.

Any possible liability for the costs of compliance with environmental statutes and the amount of such liability is a genuine factual issue that can only properly be resolved by a factfinder and, at this point, may be resolved in favor of either party. *See Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511. Even though this court preliminarily believes, based on the current record, that Dock's Corner has a weak case, granting a motion for summary judgment on environmental liability is improper. A trial is necessary so the court may hear testimony, review additional documentary evidence, if any, and to make findings of fact and render conclusions of law regarding asserted liability and costs resulting from alleged environmental damage to the Premises. Dock's Corner is entitled to its day, or days, in court on this issue.

### D. *Administrative Priority*

Dock's Corner asserts it is entitled to an administrative priority for any costs of compliance with state or federal environmental statutes and for any rent or other charges reserved under the Arnox leases. Although the court is unable to determine liability under the environmental statutes at this time, it is now able to determine, as a matter of law, whether any valid claims for environmental clean up should be entitled to administrative priority.

 Dock's Corner may not seek an administrative claim for unpaid rent under the Arnox leases. No relevant lease exists. Nevertheless, the court will consider whether Dock's Corner may be entitled to chapter 7 administrative priority for storage costs, or use and possession costs.

11 U.S.C. § 503(b)(1)(A) provides:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f), including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]

Section 507(a)(1) authorizes first priority to administrative expenses allowed pursuant to § 503(b).

 The Sixth Circuit Court of Appeals has addressed the issue of allowance of administrative expenses in *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106 (6th Cir.1987), and *United Trucking Serv., Inc. v. Trailer*

*Rental Co. (In re United Trucking Serv., Inc.),* 851 F.2d 159 (6th Cir.1988). The purpose of the administrative priority provisions of the Bankruptcy Code is "to facilitate the rehabilitation of insolvent businesses by encouraging third parties to provide those businesses with necessary goods and services." *United Trucking Serv.,* 851 F.2d at 161. In determining what constitutes an administrative expense, the Sixth Circuit recognized the following elements:

[A] claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate.

*White Motor,* 831 F.2d at 110 (citing *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976)). *Accord, United Trucking Serv,* 851 F.2d at 161–62; *Matter of Zook,* 83 B.R. 447, 449 (Bankr.W.D.Mich.1988). Only postpetition debts may be accorded administrative expense priority. *Burlington Northern R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700, 707 (9th Cir.1988); *United Trucking Serv.,* 851 F.2d at 161; *Mammoth Mart,* 536 F.2d at 954–55; *Matter of Baldwin-United Corp.,* 43 B.R. 443, 453 (S.D.Ohio 1984).

▮▮▮ Paraphrasing § 503(b)(1)(A) and Sixth Circuit precedent, an administrative priority should be allowed when a claim is for an actual and necessary expense, that directly and substantially benefitted the estate, and was incurred postpetition by the debtor in possession.[14]

### 1. Possible Chapter 7 Administrative Claim for Storage or Use and Possession

▮▮▮ Even absent a lease between Dock's Corner and the Debtor, it is undisputed that Arnox allowed the Debtor to use and possess a portion of the Premises. (*See* Trustee's Answer at 2; Bank's Answer at 2; Affidavit of David R. Biek dated March 28, 1991; Affidavit of Gerald L. Barefield dated August 21, 1991.) The Debtor's estate continued to use and possess a portion of the Premises during the pendency of the chapter 7 case. Estate property was stored on the Premises including the wood inventory in which the Bank held a perfected security interest. (*See* Affidavit of Lawrence S. Berger dated July 30, 1991; Affidavit of Gerald L. Barefield dated August 21, 1991; Affidavit of David R. Biek dated August 23, 1991.)

▮▮▮ It is a well established that postpetition storage costs, or use and possession costs, may be granted administrative expense priority. *See In re Rare Coin Galleries of America,* 72 B.R. 415 (D.Mass. 1987); *In re Bio–Med Laboratories,* 131 B.R. 72 (Bankr.N.D.Ohio 1991); *In re Grimm & Rothwell, Inc.,* 108 B.R. 186 (Bankr.S.D.Ohio 1989); *In re Gillis,* 92 B.R. 461 (Bankr.D.Haw.1988); *First Hawaiian Bank v. Anderson (In re Central Pacific Boiler Piping),* 88 B.R. 277 (Bankr. D.Haw.1988); *Zaisan, Inc. v. Braden Cornerstone Partnership (In re Zaisan, Inc.),* 80 B.R. 832 (Bankr.S.D.Tex.1987); *McDonald v. Manning (In re Perret),* 63 B.R. 973 (Bankr.N.D.N.Y.1986). "The actual and necessary expenditures of the trustee for the costs of operating a business, for *storage of property* ... are contemplated within the phrase 'actual and necessary costs and expenses of preserving the estate.'" 3 L. KING, COLLIER ON BANKRUPTCY ¶ 503.04, at 503–20 (15th ed. 1991) (emphasis added).

In *Grimm & Rothwell,* Judge Cole was confronted with a similar fact situation. After the debtor filed a chapter 7 case, its inventory, machinery, and equipment remained, before it was sold, on the property of its former landlord. The court determined that no postpetition written or oral lease existed between the debtor and landlord. 108 B.R. at 188. Notwithstanding the lack of a formal lease agreement, the court allowed an administrative expense

---

**14.** If a trustee is subsequently appointed, a court may decide whether an expense is accorded administrative priority by determining whether a postpetition debt arose from a transaction involving the trustee. *See* 11 U.S.C. §§ 721 and 1108.

priority for the postpetition storage. *Id.* at 190. The court stated:

> Although the controverted evidence submitted ... did not meet the quantum of proof necessary to establish the existence of a rental agreement, the Trustee's use of the warehouse as storage space was necessary and preserved the assets of the estate until such assets were eventually sold at auction. For such valuable services, an allowance for rent is equitable under the circumstances to the extent of the actual amount of space used as storage. Clearly, the Trustee has benefitted from use of the Leased Premises, which was operated to preserve the estate. This benefit is measured by the value of the storage.

*Id.* (citations omitted).

The court finds the analysis in *Grimm & Rothwell* to be persuasive. Although no formal rental agreement exists in this case, it is undisputed that property of the estate remained on Dock's Corner's real property postpetition until it was sold or abandoned. As in *Grimm & Rothwell,* the use of the Premises to store the personal property is an actual cost which was necessary to preserve assets of the estate until they were sold or abandoned. The estate has directly and substantially benefitted from the use of the Premises for storage. To allow the Trustee to store the property at no cost is clearly a windfall to the estate. In consideration of the postpetition use of the Premises by the estate, the court holds that Dock's Corner is entitled to chapter 7 administrative expense priority under to § 503(b)(1)(A).[15]

The court is now unable to determine the amount of the chapter 7 administrative storage expense. There is conflicting evidence concerning the amount of space used by the estate to store the personal property, the length of time the personal property was stored postpetition, and the fair rental value of the premises used. (*See* Affidavit of Lawrence S. Berger dated July 30, 1991; Affidavit of Gerald L. Barefield dated August 21, 1991; Affidavit of David R. Biek dated August 23, 1991.) Therefore, a trial is necessary to consider these issues to determine the amount of Dock's Corner's administrative claim for the estate's use and possession of the Premises.

2. Possible Chapter 7 Administrative Claim for Cost of Compliance with Environmental Statutes

Dock's Corner asserts it is entitled to an administrative priority for the cost of compliance to cure alleged environmental damage caused by the Debtor or Trustee. Environmental clean up costs will be entitled to administrative priority if they are actual and necessary expenses for preservation of the estate, that directly and substantially benefitted the estate, and were incurred postpetition by the debtor in possession or trustee. *See* 11 U.S.C. § 503(b)(1)(A); *White Motor Corp.*, 831 F.2d at 110; *United Trucking Serv.*, 851 F.2d at 161.

Generally, the costs of compliance with environmental statutes for prepetition actions of the debtor are accorded general unsecured status. *See Dant & Russell,*

---

**15.** Although not as analogous as *Grimm & Rothwell, In re Bio–Med Labs., supra,* influences the court's decision to allow administrative expense priority for storage costs despite the lack of a formal agreement between the parties. In *Bio–Med,* the court allowed an administrative expense for the fair rental value of leased premises used by a holdover tenant postpetition. The court held that a landlord is entitled to recover fair rental value of the premises during the holdover term. *See Gillis,* 92 B.R. at 465; *Rare Coin Galleries,* 72 B.R. at 417. Judge Baxter reasoned that the landlord allowing the debtor to remain on the premises as a holdover tenant undoubtedly preserved and benefitted the estate. Additionally, the debtor holding over prevented the landlord from renting the property to another person.

A holdover tenancy is analogous to this case because a holdover tenant occupies property of the landlord without having a formal rental agreement. The fact that a holdover tenant previously was a party to a formal lease agreement does not distinguish it from this case. In both instances, the debtor or trustee occupies and uses the landlord's real property postpetition for the benefit of the estate. Consequently, the analysis in *Bio–Med* is applicable to holding the fair rental value for storage of property of the estate should be afforded chapter 7 administrative expense priority.

853 F.2d at 709; *In re Bill's Coal Co.*, 124 B.R. 827, 829 (D.Kan.1991); *In re Torwico Elec., Inc.*, 131 B.R. at 571–72; *In re Heldor Indus.*, 131 B.R. 578, 586–87 (Bankr. D.N.J.1991); *Walsh v. State of West Virginia (In re Security Gas & Oil, Inc.)*, 70 B.R. 786, 795 (Bankr.N.D.Cal.1987); *In re Pierce Coal & Constr. Co.*, 65 B.R. 521, 530 (Bankr.N.D.W.Va.1986); Mirsky, Conway & Humphrey, *The Interface Between Bankruptcy and Environmental Laws*, 46 BUS.LAW. 623, 654 (Feb. 1991). Courts have found a limited exception to this rule where postpetition costs have been expended by an entity to remedy prepetition environmental damage. *See LTV Corp. v. United States (In re Chateaugay)*, 944 F.2d 997 (2d Cir.1991); *Lancaster v. State of Tennessee (In re Wall Tube & Metal Products Co.)*, 831 F.2d 118 (6th Cir.1987); *Windolph Trust v. Leitch (Matter of Kent Holland Die Casting & Plating, Inc.)*, 125 B.R. 493 (Bankr.W.D.Mich.1991); *In re Peerless Plating Co.*, 70 B.R. 943 (Bankr. W.D.Mich.1987); *In re T.P. Long Chem., Inc.*, 45 B.R. 278 (Bankr.N.D.Ohio 1985); Mirsky, Conway & Humphrey, *supra*, at 654.

In *Wall Tube*, the Sixth Circuit held a state which *expends* money postpetition to cure prepetition environmental damage is entitled to an administrative claim. 831 F.2d at 123. The Tennessee Department of Health and Environment (herein "TDHE") inspected the site and found environmental damage prepetition. The TDHE then expended funds to clean up the site after the bankruptcy petition was filed. The Sixth Circuit relied on *T.P. Long*, which concluded that because the estate, rather than the trustee, is the owner of the hazardous waste causing product, i.e., barrels, drums, wood, the cost of compliance is a claim against the estate, not the trustee. 45 B.R. at 283.[16] After recognizing that environmental statutes are intended to protect the public from the effects of pollution, the Sixth Circuit concluded:

> [S]ince the estate cannot avoid the liability imposed by CERCLA, it follows that the cost incurred ... in discharging this liability *is an actual, necessary cost of preserving the estate entitled to administrative expense priority.*

831 F.2d at 123–24 (emphasis in original) (quoting *T.P. Long*, 45 B.R. at 286).[17] "The necessity of the expense cannot be questioned since the removal of the wastes was an obligation of the estate...." *T.P. Long*, 45 B.R. at 287.

 *Wall Tube* may be distinguished from the present case because it involved a government agency instead of a private entity. In *Kent Holland Die Casting & Plating*, Judge Nims extended the analysis set forth in *Wall Tube* to private entities. 125 B.R. at 501. Other courts have also ruled private entities may be allowed administrative priority for costs of complying with environmental clean up statutes. *See In re Stevens*, 68 B.R. 774, 780 n. 5 (D.Me. 1987); *Pierce Coal & Constr.*, 65 B.R. at 530. Therefore, following the analysis in *Wall Tube*, any prepetition environmental damage caused by property of the estate will enjoy administrative expense priority as long as there are *actual costs* incurred.[18] If no actual costs are incurred,

**16.** In *T.P. Long*, Judge White defined the issue as:

> The E.P.A.'s claim for an administrative expense is a claim against the estate, not against the trustee. The trustee is involved only insofar as he is the representative of the estate. The issue is whether the *estate, not the trustee,* is liable under CERCLA.

45 B.R. at 283 (emphasis added).

**17.** *Wall Tube* analyzed environmental claims under CERCLA. This court believes that analysis is also applicable to the state environmental statutes raised in this proceeding. Since the environmental statutes provide for strict liability, they are comparable. *See* N.J.Stat.Ann.

§§ 13:1K–13 and 58:10–23.11g; 42 U.S.C. § 9607(a); *Sterling Steel*, 94 B.R. at 928; *T.P. Long*, 45 B.R. at 282.

**18.** Although the Ninth Circuit concluded, under different facts, that compliance costs for prepetition environmental damage were unsecured, it agreed with the Sixth Circuit's analysis in *Wall Tube. See Dant & Russell*, 853 F.2d at 709 ("Quite a different result, however, is warranted when the cleanup costs result from monies expended for the preservation of the bankruptcy estate.... When a claimant expends funds that preserve the estate, treatment as an administrative expense is authorized by Bankruptcy Code.").

any prepetition environmental damage will constitute a general, unsecured claim.

■■■ As a general rule, if a release of hazardous substances arises postpetition, clean up costs incurred to preserve the estate are classified as administrative expenses. *See Juniper Dev. Group v. Kahn (In re Hemingway Transport, Inc.),* 126 B.R. 656, 661 (D.Mass.1991); *Bill's Coal Co.,* 124 B.R. at 830; *In re Vernon Sand & Gravel, Inc.,* 93 B.R. 580, 582 (Bankr.N.D.Ohio 1988); *Security Gas & Oil,* 70 B.R. at 795 n. 5; *Pierce Coal & Constr.,* 65 B.R. at 530–31; Mirsky, Conway & Humphrey, *supra,* at 654.[19] Therefore, any costs incurred for environmental damage caused postpetition will be entitled to administrative priority pursuant to § 503(b)(1)(A).

■■■ This court is now unable to determine if the Debtor's estate is liable to Dock's Corner for compliance with the various environmental statutes. Issues include whether: (1) there was any environmental damage caused by the estate; (2) any asserted environmental damage occurred prepetition or postpetition; and, (3) any costs of compliance with environmental statutes are therefore entitled to administrative priority. A trial will take place at which time parties may present additional evidence.[20]

### E. *Requested Surcharge of Bank's Personal Property Proceeds*

Dock's Corner claims it is entitled to surcharge the proceeds from the sale of

the Bank's personal property collateral for both unpaid rent and the costs of any environmental clean up. 11 U.S.C. § 506(c). The Bank and Trustee argue that Dock's Corner lacks standing to surcharge and, even assuming standing exists, Dock's Corner cannot satisfy the statutory elements to surcharge the Bank's proceeds.

Section 506(c) states:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Section 506(c) is an exception to the traditional rule that administrative expenses may not be charged against the collateral of a secured creditor. *Matter of Trim–X,* 695 F.2d 296, 301 (7th Cir.1982); *Guy v. Grogan (In re Staunton Indus., Inc.),* 74 B.R. 501, 504 (Bankr.E.D.Mich.1987); *In re Wyckoff,* 52 B.R. 164, 166 (Bankr. W.D.Mich.1985). However, a secured creditor may be surcharged when expenses to preserve its property have been incurred by the estate, or the creditor has caused or consented to such expense.[21] *Trim–X,* 695 F.2d at 301; *Staunton Indus.,* 74 B.R. at 504; *Wyckoff,* 52 B.R. at 166.

#### 1. Standing to Seek Surcharge

■■■ Reported cases are divided on the issue of whether a party other than the trustee or debtor in possession may be able to surcharge a secured creditor's collateral pursuant to § 506(c).[22] Courts holding that

---

**19.** Even if Dock's Corner has not incurred actual costs, an administrative priority may still be allowed if the environmental damages resulted from negligent postpetition operation of the estate. *See Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). The record before the court indicates that the Debtor basically terminated operations on the date of filing for bankruptcy. (*See* Affidavit of David R. Biek dated March 28, 1991.) At this time, there is no evidence to demonstrate negligent postpetition operation of the estate. Since the Debtor's business basically terminated upon filing, the possibility of negligent postpetition operations seems remote.

**20.** Such a trial may be a waste of time and expense of the parties. Even if Dock's Corner has expended funds to remedy the alleged envi-

ronmental damage, this Debtor's estate may be determined to not be liable for the pollution. If the estate is liable, it likely has little, if any, funds to satisfy the administrative claim unless Dock's Corner may surcharge the Bank's personal property sale proceeds.

**21.** The Bank has not consented to surcharging the proceeds of its collateral. (*See* Affidavit of Michael Stolz dated April 4, 1991.)

**22.** Although the express language of § 506(c) only mentions the trustee, a debtor in possession is also permitted to surcharge a secured creditor's collateral. *See* 11 U.S.C. § 1107(a) which gives the debtor in possession the same rights and powers as a trustee. Hereinafter, whenever "trustee" is referred to, it is intended to include a chapter 11 debtor in possession.

a strict interpretation of § 506(c) is required, therefore the trustee is the only party with standing to assert surcharge, include: *White Front Feed & Seed, Inc. v. State Nat'l Bank of Platteville (In re Ramaker)*, 117 B.R. 959 (Bankr.N.D.Iowa 1990); *Central States, Southeast and Southwest Areas Pension Fund v. Robbins (In re Interstate Motor Freight Sys., IMFS, Inc.)*, 86 B.R. 500 (Bankr.W.D.Mich. 1988) (herein *"Interstate II"*); *Central States, Southeast and Southwest Areas Pension Fund v. Robbins (In re Interstate Motor Freight Sys., IMFS, Inc.)*, 71 B.R. 741 (Bankr.W.D.Mich.1987) (herein *"Interstate I"*); *In re Dakota Lay'd Eggs*, 68 B.R. 975 (Bankr.D.N.D.1987); *In re Wyckoff*, 52 B.R. 164 (Bankr.W.D.Mich.1985)[23]; *In re Fabian*, 46 B.R. 139 (E.D.Pa.1985); *In re Proto–Specialties*, 43 B.R. 81 (Bankr. D.Ariz.1984); *In re Codesco, Inc.*, 18 B.R. 225 (Bankr.S.D.N.Y.1982).

Courts holding that an entity other than the trustee has standing to surcharge under § 506(c) include: *In re Parque Forestal, Inc.*, 949 F.2d 504 (1st Cir. Nov. 19, 1991); *New Orleans Pub. Serv. v. First Fed. Sav. & Loan Ass'n of Warner Robins, Georgia (Matter of Delta Towers, Ltd.)*, 924 F.2d 74 (5th Cir.1991); *Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Co.)*, 799 F.2d 91 (3d Cir.1986); *In re Mechanical Maintenance*, 128 B.R. 382 (E.D.Pa.1991); *Fulcrum Int'l, Ltd. v. Saybrook Mfg. Co.*, 124 B.R. 141 (M.D.Ga.1991); *In re Scopetta–Senra Partnership III*, 129 B.R. 700 (Bankr. S.D.Fla.1991); *Cavender v. Ameritrust Co., N.A. (In re Opti–Gage)*, 124 B.R. 515 (Bankr.S.D.Ohio 1991); *In re So Good South Potato Chip Co.*, 116 B.R. 144

(Bankr.E.D.Mo.1990); *Geller v. International Club Enter., Inc. (In re International Club Enter., Inc.)*, 105 B.R. 190 (Bankr.D.R.I.1989); *In re World Wines, Ltd.*, 77 B.R. 653 (Bankr.N.D.Ill.1987); *Guy v. Grogan (In re Staunton Indus., Inc.)*, 74 B.R. 501 (Bankr.E.D.Mich.1987); *In re T.P. Long Chem., Inc.*, 45 B.R. 278 (Bankr.N.D.Ohio 1985).[24]

Some courts have denied § 506(c) standing to parties other than the trustee relying mainly on the clear language of the statute. *See Ramaker*, 117 B.R. at 966; *Fabian*, 46 B.R. at 141; *Wyckoff*, 52 B.R. at 167; *Proto–Specialties*, 43 B.R. at 83; *Codesco*, 18 B.R. at 230. The statute specifically states that a "trustee" may surcharge, therefore these courts follow the strict interpretation of the code section.

A leading case holding that only the trustee has standing to surcharge is *Interstate I, supra.* In that case, the plaintiffs were employee benefit funds that requested the court to surcharge secured creditors for alleged benefits received during the bankruptcy proceeding. 71 B.R. at 742. In determining whether the employee benefit funds had standing under § 506(c), the court considered a major policy of the Bankruptcy Code. The court stated:

> One overarching object of the Bankruptcy Code is *equality of distribution to like situated creditors.* An expression of this policy is found at 11 U.S.C. § 726(b) which provides in essence that all claimants, including administrative claimants, whose claims accrued in the same chapter shall be reimbursed pro rata.

*Id.* at 744 (emphasis added). Since there is no priority among a class of claimants,

---

**23.** A leading treatise on bankruptcy mistakenly contends that *Wyckoff* supports the view that a party other than the trustee has standing to surcharge under § 506(c). *See* 3 L. KING, COLLIER ON BANKRUPTCY ¶ 506.06, at 506–57 n. 7a (15th ed. 1991). As noted in *Interstate I:*

> A careful reading of *Wyckoff* reveals that it relies upon *In re Proto Specialties, Inc.,* which specifically held that administrative claimants do not have [§ 506(c) ] standing. Furthermore, although *Wyckoff* held that the Court had the discretion to permit the landlord a recovery, that recovery was only a partial

reimbursement of the rent due, and it was charged against the estate's equity in the collateral which remained after the secured creditor had been paid in full. *Wyckoff* did not permit any expenses to charged against the secured creditor.

71 B.R. at 743 n. 2 (citation omitted).

**24.** The court notes that the cases cited for both interpretations are not an exhaustive list of decisions regarding the issue of § 506(c) standing. For additional case law, see, 3 L. KING, COLLIER ON BANKRUPTCY ¶ 506.06, at 506–57 n. 7a (15th ed. 1991).

allowing one claimant to recover a surcharge from a secured creditor while other similarly situated claimants recover less or nothing, violates the equality of distribution principle as expressed in § 726(b). *Id.* The court concluded:

> It has been observed that the construction of a statute "that produces the greatest harmony and the least inconsistency is that which ought to prevail." *Attorney General v. Sillem,* 2 H & C 431, 517, 15 Eng.Repr. 178, 217 (1864). That prevailing construction is the one which harmonizes § 506(c) and § 726(b) by limiting standing under § 506(c) to trustees and debtors in possession. Since that is the literal meaning of § 506(c) ... this result is in accord with the usual assumption that "the legislative purpose is expressed by the ordinary meaning of the words used." *Richards [v. U.S.],* 369 U.S. [1] at 9, 82 S.Ct. [585] at 591 [7 L.Ed.2d 492 (1962) ].

*Id.* at 745.

A leading case which grants standing to parties other than the trustee is *McKeesport Steel Castings Co., supra.* In *McKeesport,* the plaintiff was a utility company that requested to surcharge a secured creditor's collateral for unpaid postpetition gas service provided to the debtor. 799 F.2d at 93. The Third Circuit acknowledged the cases requiring strict interpretation of § 506(c), yet held that the utility company had standing. *Id.* at 94. The court reasoned:

> The rule that individual creditors cannot act in lieu of the trustee is often breached when sufficient reason exists to permit the breach. In this case, neither the debtor in possession nor a creditors committee had reason to make a claim on behalf of [the creditor], when the debtor thereby would be required to pay for utilities it had received without charge following the date that its petition was filed. Thus, because [the creditor] had a *colorable claim for expenses and was the only creditor that would zealously pursue that claim,* it has standing to bring a § 506(c) action.

*Id.* (emphasis added). *Accord, Staunton Indus.,* 74 B.R. at 506.

Other courts have used similar reasoning to allow non-trustee standing. *See Parque Forestal,* 949 F.2d 504, 512 (following *McKeesport* without independent reasoning); *Delta Towers,* 924 F.2d at 77 (strict interpretation of § 506(c) may result in a windfall benefit to a secured creditor at the detriment of a third party); *Scopetta–Senra,* 129 B.R. at 702 (same); *Fulcrum Int'l,* 124 B.R. at 145 (better rule is to allow claimant to surcharge where it can demonstrate trustee will not proceed itself); *International Club Enter.,* 105 B.R. at 193 (same); *So Good South Potato Chip Co.,* 116 B.R. at 146 (relying on both rationales). *See also* 3 L. KING, COLLIER ON BANKRUPTCY ¶ 506.06, at 506–57 n. 7a (stating that the better view is the *McKeesport* reasoning).

To determine if Dock's Corner has standing to surcharge the Bank's collateral pursuant to § 506(c), the first inquiry must focus on statutory interpretation. This court is cognizant of the standards for statutory interpretation as summarized by Judge Miles in *Hill v. United States,* 720 F.Supp. 95, 97 (W.D.Mich.1989), wherein it is stated:

> Statutory interpretation begins with an analysis of the statute's language. *Mallard v. United States District Court for the Southern District of Iowa,* [490] U.S. [296] 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989); *Timber Company v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985). If the statutory scheme is coherent and consistent, there is no need to inquire beyond the plain language of the statute. *United States v. Ron Pair Enterprises, Inc.,* [489] U.S. [235], 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). If the language is clear, "the sole function of the court is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). This rule is conclusive "except in rare cases where the literal application of a statute will produce a result demonstrably at odds with the intention of the drafters[.]" *Griffin v. Oceanic Con-*

*tractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). In such a rare situation where the statute appears to contravene intent or conflict with other statutes, courts must adopt "a restrictive rather than a literal or usual meaning of its words[.]" *Id.*

 The governing language in § 506(c) regarding standing is "[t]he *trustee* may recover from property securing an allowed secured claim...." If the statute's language is plain and unambiguous, further inquiry is superfluous and the court should enforce the language in accordance with its terms. *Ron Pair Enter.,* 489 U.S. at 241, 109 S.Ct. at 1030 (citing *Caminetti,* 242 U.S. at 485, 37 S.Ct. at 194). *Accord, Burlington N. R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987); *United States v. Mansfield Tire & Rubber Co. (In re Mansfield Tire & Rubber Co.),* 942 F.2d 1055, 1058 (6th Cir.1991); *Hill,* 720 F.Supp. at 96. If the statute is clear, it is the court's obligation, as enforcer of laws, to comply with Congress' intent. To do otherwise would usurp the legislature's authority and exceed the function of the judiciary.

 Even if the statutory language is plain and unambiguous, a court may not enforce a statute if its "literal application ... will produce a result demonstrably at odds with the intention of its drafters." *Ron Pair Enter.,* 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin,* 458 U.S. at 571, 102 S.Ct. at 3250). In these rare cases, the intention of the drafters, rather than the strict language, controls. *Id.* In such a case, the court should look to the legislative history of the statute or other pertinent factors for guidance as to Congress' intent.

 Reiterating, statutory interpretation involves two possible inquiries. First, is the statute plain and unambiguous? If the answer is affirmative, the inquiry ceases and the statute is enforced. If the answer is negative, the court must use all efforts to determine Congress' intent and obtain the best result. Second, even if the statute is plain and unambiguous, does enforcement result in a conflict with Congress' intent in enacting the statute? If the answer is affirmative, the court must look to the legislative history of the statute to obtain Congress' intent. If the answer is negative, the inquiry ceases and the statute is enforced.

This court concurs with other courts which have found that the express language of § 506(c) is clear and unambiguous. *See Ramaker,* 117 B.R. at 966; *Interstate II,* 86 B.R. at 504; *Interstate I,* 71 B.R. at 745; *Fabian,* 46 B.R. at 141. Section 506(c) simply and clearly states that the *trustee* is able to surcharge a secured creditor's collateral. There is no reference in the statute to "affected entity", "aggrieved person", or other parties. It is not the court's role to add language to § 506(c). If Congress believes it is proper that other parties should have standing to surcharge the collateral of secured creditors, it can amend § 506(c). This court declines to infringe upon Congress' role as maker of laws and judicially add language to the statutory subsection.[25]

Even though the statute is clear and unambiguous, Dock's Corner may have standing to surcharge if such a result is "demonstrably at odds with the intention of [the] drafters." *Ron Pair Enter.,* 489 U.S. at 242, 109 S.Ct. at 1031. The legislative history of § 506(c) states:

Any time the *trustee or debtor in possession* expends money to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the *trustee*

**25.** As noted by Justice Frankfurter:

[Courts] are under the constraints imposed by the judicial function in our democratic society. As a matter of verbal recognition certainly, no one will gainsay that the function in construing a statute is to ascertain the meaning of words used by the legislature. The great judges have constantly admonished their brethren of the need for discipline in observing the limitations. *A judge must not rewrite a statute, neither to enlarge it nor contract it.*

Frankfurter, *Some Reflections on the Reading of Statutes,* 47 COLUM.L.REV. 527, 533–34 (1947) (emphasis added).

*or debtor in possession* is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.

124 CONG.REC. H11,095 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards) (emphasis added). The intention of the drafters as expressed in the legislative history of § 506(c) is also clear and unambiguous. The legislative history only refers to the trustee or debtor in possession. There is absolutely no reference to allowing a third party to attempt to surcharge a secured creditors' collateral. Congress' intent is crystalline. Only trustees or debtors in possession may surcharge pursuant to § 506(c).

▇▇▇▇ Despite the clear language of the statute and legislative history, some courts have ignored the plain meaning of § 506(c) and allowed entities other than the trustee or debtor in possession to surcharge. This is mainly because those courts believe that to not allow standing to third parties will produce inequitable results. This court disagrees. A bankruptcy court may not use equitable principles to disregard unambiguous statutory language. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206–07, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1989); *Ray v. City Bank & Trust Co. (In re C–L Cartage Co.),* 899 F.2d 1490, 1494 (6th Cir.1990). "[A] bankruptcy court does not have unfettered equity power to authorize it to make any decision which it deems to be 'fair'." *Schewe v. Fairview Estates (Matter of Schewe),* 94 B.R. 938, 950 (Bankr. W.D.Mich.1989). The equitable powers of a bankruptcy court must be confined within the boundaries of the Bankruptcy Code. *Id.* (citing *Norwest Bank,* 485 U.S. at 206–07, 108 S.Ct. at 968–69).

As stated in *Interstate I,* a fundamental policy of the entire Bankruptcy Code is the equality of distribution to similarly situated creditors. 71 B.R. at 744. Section 726(b), which provides that all claimants whose claims are entitled to the same class of distribution shall be reimbursed pro-rata, is a Congressional expression of this policy.[26] This fundamental policy is a main objective of the Bankruptcy Code.

> We have often declared that the pro-rata distribution of the property of the bankrupt was the main purpose of the bankruptcy statute.... A serious defect in that statute would be developed if its provisions received such a construction as would enable the appellant to defeat that purpose by obtaining an advantage over other creditors. We are of the opinion that no such construction is demanded either by [the bankruptcy statute's] letter or its spirit.

*Reed v. McIntyre,* 98 U.S. 507, 512, 25 L.Ed. 171 (1879) (citation omitted). *Accord, United States v. Embassy Restaurant,* 359 U.S. 29, 31, 79 S.Ct. 554, 555, 3 L.Ed.2d 601 (1959); *Nathanson v. NLRB,* 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952); *Young v. Higbee Co.,* 324 U.S. 204, 210, 65 S.Ct. 594, 597, 89 L.Ed. 890 (1945); *Sampsell v. Imperial Paper & Color Co.,* 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941); *Kothe v. R.C. Taylor Trust,* 280 U.S. 224, 227, 50 S.Ct. 142, 143, 74 L.Ed. 382 (1930); *Acme Harvesting Co. v. Beekman Lumber Co.,* 222 U.S. 300, 307, 32 S.Ct. 96, 99, 56 L.Ed. 208 (1911); *First Nat'l Bank of Baltimore v. Staake,* 202 U.S. 141, 148, 26 S.Ct. 580, 583, 50 L.Ed. 967 (1906); *Boese v. King,* 108 U.S. 379, 385–86, 2 S.Ct. 765, 769–70, 27 L.Ed. 760 (1883); *Wukelic v. United States,* 544 F.2d 285, 289 (6th Cir.1976); *In re Kohler,* 159 F. 871, 873–74 (6th Cir.1908); *Lasich v. Estate of A.N. Wickstrom (Matter of Wickstrom),* 113 B.R. 339, 348 (Bankr. W.D.Mich.1990). An axiom of the Bankruptcy Code is equality of distribution; therefore, "if one claimant is to be preferred over others, the purpose should be *clear* from the statute." *Nathanson,* 344 U.S. at 29, 73 S.Ct. at 83 (emphasis added).

**26.** Section 1123(a)(4) also is an expression of the fundamental policy that similarly situated creditors must share pro-rata. *See* 3 L. KING, COLLIER ON BANKRUPTCY ¶ 1123.01[4], at 1123–9 n. 10 (15th ed. 1991) ("The fact that the theme of the Bankruptcy [Code] is equality of distribution is a fundamental and long recognized principle.").

Allowing a party other than the trustee or debtor in possession the standing to surcharge under § 506(c) both violates the statute and a principal policy of bankruptcy law, as reiterated by the Supreme Court in decisions over more than the past hundred years, that like situated creditors must share equally in distribution. If an individual administrative claimant is permitted to independently seek to surcharge a secured creditor, it might receive a full reimbursement of its claim, while other administrative claimants might receive nothing or share pro-rata. In effect, if successful in surcharging, the administrative creditor's status would be elevated from general administrative claimant to a superpriority administrative or a secured claimant. The unfair effect of this result is especially evident in a case where the estate has no funds for claimants other than secured creditors. Allowing a third party to surcharge would enable it to fully recover its claim, while the rest of its class receives little or nothing.

Congress has enunciated distribution principles and priorities throughout the Code. This court may not judicially create priorities or subclasses within classes Congress has mandated. *Interstate I,* 71 B.R. at 745. *Cf., Joint Indus. Bd. of Electrical Indus. v. United States,* 391 U.S. 224, 228, 88 S.Ct. 1491, 1493, 20 L.Ed.2d 546 (1968). Cases which have allowed a non-trustee independent standing to surcharge for its own sole benefit completely disregard the fundamental bankruptcy principle of equality of distribution among similarly situated classes. These cases ignore the code language, the legislative history, and over a hundred years of Supreme Court precedent in the name of fairness. This court refuses to be blind or deaf to such precedent.[27]

Assume for a moment that a court may ignore the bankruptcy statute and uncontradictory legislative history and exercise equitable powers as it deems "fair"—are cases that grant independent standing to a creditor to attempt to directly surcharge a secured creditor well-reasoned? Almost all cases that determine independent standing exists include a circumstance in which a trustee has failed or neglected to seek to surcharge. To justify the existence of independent standing, those courts focus upon the unfair detriment to the administrative claimant which has supplied goods or services and the unjustified windfall that is received by a secured creditor. Because of this inequity, some courts take a great leap forward and grant independent standing to the administrative claimant to *directly* sue the secured creditor. *See, e.g., Parque Forestal, supra; Delta Towers, supra; McKeesport, supra; Scopetta–Senra, supra.* Those courts often support their holdings based upon arguably analogous instances when a bankruptcy court has permitted a creditors' committee (or sometimes an individual creditor) to commence litigation to avoid a transfer, recover an asset, or otherwise determine a defendant's obligation to the *estate. See, e.g., McKeesport,* 799 F.2d at 93 (citing *In re Philadelphia Light Supply Co.,* 39 B.R. 51 (Bankr. E.D.Pa.1984)).

When a debtor in possession or a trustee fails or refuses to commence litigation which may result in net value to the unsecured creditors' body, bankruptcy courts have permitted the creditors' committee or an individual creditor to pursue the cause of action *on behalf of the estate. See, e.g., Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1362–63 (5th Cir.

---

**27.** If Dock's Corner is determined to hold an allowed administrative claim against the estate, it is entitled to a pro-rata distribution with all other administrative claimants. The court takes judicial notice that the only other administrative claimants are the Trustee and Trustee's counsel. If the Trustee fails to seek a surcharge against the Bank, it is unlikely that the Trustee and his counsel will be paid in full. This court believes the Trustee will have sufficient incentive to seek to surcharge in the event Dock's Corner holds an administrative claim.

According to the court's files, orders have been docketed throughout this entire bankruptcy case allowing Trustee's counsel interim fees and expenses of $70,258.30 and $3,775.55 respectively. If there is not sufficient funds in the estate to pay Dock's Corner's allowed administrative expenses in whole, Trustee's counsel, as an administrative claimant, may be required to share pro-rata with other administrative claimants. *See* 11 U.S.C. §§ 503(b)(1)(A), 507(a)(1) and 726(a)(1).

1986) (creditors' committee allowed to pursue preference); *Unsecured Creditors' Comm. v. Noyes (In re STN Enter.),* 779 F.2d 901, 905 (2d Cir.1985) (creditors' committee allowed to pursue fraudulent or preferential transfers); *Spring Serv. Texas, Inc. v. McConnell (In re McConnell),* 122 B.R. 41, 44 (Bankr.S.D.Tex.1989) (no standing for individual creditor to bring fraud action in place of trustee because action only benefited the creditor and not the interests of the estate as a whole); *Matter of Feldhahn,* 92 B.R. 834, 836 (Bankr.S.D.Iowa 1988) (individual creditor lacked standing to bring preference and fraudulent transfer action because action only benefited creditor and not the estate as a whole); *Becker v. Security Nat'l Bank (In re Four Seasons Sporting Goods),* 46 B.R. 528, 530–31 (Bankr. N.D.Cal.1985) (creditors' committee allowed to pursue preference recovery); *Philadelphia Light,* 39 B.R. at 52–53 (creditors' committee allowed to pursue preference recovery); *Unsecured Creditors' Comm. v. Farmers Sav. Bank (In re Toledo Equip. Co.),* 35 B.R. 315, 319–20 (Bankr.N.D.Ohio 1983) (creditors' committee allowed to pursue preference recovery).

In these types of cases, the courts have granted a creditors' committee or an individual creditor *derivative* standing. The substitute plaintiff is awarded the power and the right to assert the trustee's standing for the benefit of the estate and *not for its own individual benefit.* This analysis and practical solution recognizes, either explicitly or implicitly, that only the trustee has standing for the estate. *See Waldschmidt v. Commerce Union Bank (In re Bauer),* 859 F.2d 438, 441 (6th Cir.1988), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989); *Spence v. Pontack (In re Tvorik),* 83 B.R. 450, 456 (Bankr. W.D.Mich.1988). *Cases that allow an entity to be substituted for the trustee as a plaintiff should not be interpreted to create independent direct standing for a creditor to assert a cause of action for its sole individual benefit.*

*McKeesport* fails to recognize the important distinction between independent standing and derivative standing to assert a trustee's cause of action. *McKeesport* states:

> Based on the above cases, we hold that [the creditor] has standing to recover. The rule that individual creditors cannot act in lieu of the trustee is often breached when sufficient reason exists to permit the breach. In this case, neither the debtor in possession nor a creditors committee had reason to make a claim on behalf of [the creditor], when the debtor thereby would be required to pay for utilities it had received without charge following the date that its petition was filed. Thus, because [the creditor] had a colorable claim for expenses and was the only creditor that would zealously pursue that claim, it has standing to bring a § 506(c) action.

799 F.2d at 94. The cases relied upon by *McKeesport* do not adequately support that court's conclusion quoted above.

In *Philadelphia Light, supra,* the court permitted the creditors' committee, after seeking permission from the court, to continue prosecuting a cause of action to recover an asserted preferential transfer from an insider of the debtor in possession. A careful reading of that case, and the cases cited therein, demonstrates the committee was allowed to pursue the preference action for the benefit of the estate and its creditor body. No independent standing was stated to exist. The committee was granted authority to exercise the debtor in possession's rights—*derivative* standing was allowed.

In *In re Isaac Cohen Clothing Corp.,* 39 B.R. 199 (Bankr.S.D.N.Y.1984), the court considered whether a landlord would be permitted to recover use and occupancy charges from proceeds of the sale of a bank's collateral. In that decision, the court focused solely upon the benefit to the bank from the storage of equipment on the landlord's premises. The issue of the landlord's standing was not discussed or even mentioned in the opinion. *McKeesport's* reliance upon *Isaac Cohen* on the standing issue is therefore erroneous.

In *T.P. Long, supra,* the court accepted the United States Environmental Protection Agency's argument that it should be allowed to assert a claim against a secured creditor under § 506(c). It was first acknowledged that "[b]y its own terms, section 506(c) refers to a *trustee's power* to recover expenses from a secured creditor." 45 B.R. at 287 (emphasis added). The court allowed the EPA to "stand in the shoes" of the trustee because "it performed a duty imposed upon the trustee to remove hazardous wastes." *Id. T.P. Long* therefore permitted *derivative* standing to the EPA. The EPA was allowed to attempt to recover funds from the secured creditor, albeit unsuccessfully, to the extent "it discharged a duty of the trustee". The special facts which gave rise to a grant of derivative standing in *T.P. Long* do not support *McKeesport's* overly-broadened conclusion which gives a creditor independent and direct standing under § 506(c).

Taking the holding in *McKeesport* to its logical extreme, every unpaid administrative claimant could sue a secured creditor under § 506(c) to seek to recover asserted costs or expenses. Any successful recovery would benefit the individual claimant. In certain instances, a definite probability would exist that one administrative claimant would be paid in full while others remain partially or fully unpaid. Such an interpretation of § 506(c) may willy-nilly spawn satellite actions resulting in a litigation free for all.

As a practical matter, and as is required by the express language of § 506(c), the much better view is that only the trustee or debtor in possession has standing to assert any § 506(c) actions against secured creditors. If the trustee or debtor in possession fails to comply with their duty, other remedies exist.[28] Therefore, with regard to the standing issue, this court strongly disagrees with both the analysis and holding of *McKeesport* and declines to follow that case and its progeny.

Summarizing, § 506(c) and its legislative history are plain and unambiguous. Both only refer to the trustee and debtor in possession as possessing standing to surcharge. An "aggrieved person", "affected entity", or another party is not referred to in the statute or legislative history. As mandated by the Supreme Court, if the statute is clear and unambiguous, this court *must* enforce it. *See Ron Pair Enter.*, 489 U.S. at 241, 109 S.Ct. at 1030. To do otherwise would be usurping the powers of the legislature. *See* Frankfurter, *supra,* at 533–34. If a party other than the trustee or debtor in possession shall have independent standing to surcharge pursuant to § 506(c), it must be by edict of Congress. Therefore, the court holds that Dock's Corner does not have independent standing to surcharge the Bank's collateral pursuant to § 506(c).[29]

**28.** Such remedies may include: (1) requesting the court to compel the trustee or debtor in possession to seek a surcharge; (2) requesting the court to remove the trustee; (3) if a debtor in possession is managing the estate, requesting the court to appoint a trustee; (4) procuring an administrative priority under § 503(b); (5) seeking court approved derivative standing to pursue the action, on behalf of the trustee, for the benefit of the estate. Also, under appropriate circumstances, a creditor may conceivably be entitled to sue a secured creditor outside of the bankruptcy court pursuant to a state law cause of action.

**29.** With the court's holding today, all four bankruptcy judges of the Western District of Michigan have held that § 506(c) standing is limited to the trustee or debtor in possession. *See In re Kessler, Inc.,* No. 90–85593 (Bankr.W.D.Mich. May 8, 1991) (bench opinion by Judge Stevenson); *Interstate I, supra* (Judge Howard); *Interstate II, supra* (Judge Howard); *In re Wyckoff, supra* (Judge Nims).

Dock's Corner argues that the court is bound by a decision of the District Court for the Western District of Michigan in *McAlpine v. Comerica Bank (In re Brown Bros.),* 136 B.R. 470 (W.D.Mich.1991). In *Brown Bros.,* the issue was whether the trustee's special counsel was entitled to compensation under a contingency fee arrangement which was to be paid from cash collateral subject to a bank's security interest. Standing under § 506(c) was never raised, argued, or addressed at trial. The bank admitted that it owed the special counsel a fee. The issue was the reasonableness of the special counsel's fee. (*See* Supplemental Memorandum of Law in Support of Trustee's Motion for Summary Judgment at 4–7) (a copy of the trial transcript is attached to the motion as Exhibit 2.)

### 2. Possible Surcharge of the Bank's Personal Property Collateral Proceeds for Costs of Compliance with Environmental Statutes

The court has held that Dock's Corner has no standing to seek a surcharge against the Bank's personal property sale proceeds. It has also been determined that genuine issues of material fact exist regarding Dock's Corner's possible chapter 7 administrative claim for compliance with federal and state environmental statutes. If such an administrative claim exists, the *Trustee* may seek to surcharge the Bank to satisfy it. Because of such potentialities, a discussion regarding the *Trustee's* ability to surcharge the Bank's personal property collateral for compliance with environmental statutes is warranted.

 Three elements must be present in order to surcharge a secured creditor with administrative expenses pursuant to § 506(c): (1) the expense must be necessary for the preservation or disposal of the collateral, (2) the amount of the expense must be reasonable, and (3) the secured creditor must benefit from the expense. *French Mkt. Homestead, FSA v. P.C. Ltd. (Matter of P.C., Ltd.),* 929 F.2d 203, 205 (5th Cir.1991); *Delta Towers,* 924 F.2d at 76; *Trim–X,* 695 F.2d at 299; *Noland v. Williamson (In re Williamson),* 94 B.R. 958, 962 (Bankr.S.D.Ohio 1988); *United States v. Van Vactor, Francis & Martin (In re Crouch),* 51 B.R. 331, 332–33 (Bankr.D.Or.1985). Prepetition expenses are generally not recoverable under § 506(c). 3 L. KING, COLLIER ON BANKRUPTCY ¶ 506.06, at 506–59 (15th ed. 1991). The burden to demonstrate the existence of the elements is on the party seeking to surcharge. *Delta Towers,* 924 F.2d at 76.

 In *T.P. Long,* the court addressed the issue of whether a bank's validly secured personal property collateral may be surcharged under § 506(c) to recover costs for compliance with CERCLA. 45 B.R. at 287. The court concluded the costs were reasonable and necessary for preservation or disposal of the secured creditor's collateral. *Id.* The remaining issue was whether the secured creditor benefitted from any compliance with CERCLA. The court ruled that the secured creditor did not receive a benefit in the traditional sense or as a holder of a secured claim. *Id.* at 288. The court concluded:

> [T]he expenditure made by the E.P.A. did not discharge a liability of, and hence did not confer a benefit on [the secured creditor]. Since the court has failed to find any other possible benefit to [the secured creditor] ... the court concludes that the E.P.A. cannot recover any portion of its expenditure from [the secured creditor] pursuant to 11 U.S.C. section 506(c).

*Id.* at 289. The court also concluded that equity did not compel it to allow a § 506(c) surcharge of the secured creditor's personal property collateral. "It would be inequitable ... to make [the secured creditor] bear the risk of all damage caused by property in which it holds a security interest." *Id.*

Other courts have followed the holding in *T.P. Long* that expenses to clean up polluted real property do not take priority over a secured creditor's valid and perfected security interest in personal property; therefore the personal property collateral may not be surcharged under § 506(c). *See, e.g., Heldor Indus.,* 131 B.R. at 586 (ECRA); *Matter of Synfax Mfg., Inc.,* 126 B.R. 30, 34 (Bankr.D.N.J.1990) (ECRA); *In re Better–Brite Plating, Inc.,* 105 B.R. 912, 916 (Bankr.E.D.Wis.1989) (CERCLA) [30]; *In*

---

Nevertheless, the district court concluded that it "adopts the majority view that the [special counsel] has standing to bring an action ... under § 506(c)." 136 B.R. at 474. Since the issue of § 506(c) standing was never before the court in *Brown Bros.,* this court finds that the statement quoted is *dictum* with no precedential affect over this proceeding. Since the bank in *Brown Bros.* admitted to the fact that it owed the special counsel a fee, it, in effect, consented to the surcharge. *See Trim–X,* 695 F.2d at 301; *Staunton Indus.,* 74 B.R. at 504; *Wyckoff,* 52 B.R. at 166. *Consent to surcharge and standing to seek surcharge are two entirely different issues.*

**30.** On October 15, 1990, Judge Ihlenfeldt entered an order partially vacating the *Better-Brite* decision. While the appeal was pending before the Seventh Circuit, the hazardous materials

re Corona Plastics, Inc., 99 B.R. 231, 236 (Bankr.D.N.J.1989) (ECRA); In re Paris Indus. Corp., 80 B.R. 2, 5 (Bankr.D.Me. 1987) (CERCLA). See also Mirsky, Conway & Humphrey, supra, at 668 ("There are many instances in which there will be little or no benefit [under § 506(c)]. For example, if the collateral is personal property ... the secured creditor will not benefit from expenses to test or clean up the real estate and therefore no Code Section 506(c) charges should be imposed.").

A constitutional reason also exists for denying a § 506(c) surcharge of a secured creditor's personal property collateral for real property environmental clean up costs. See Heldor Indus., 131 B.R. at 586. The Takings Clause of the Fifth Amendment protects a secured creditor's validly perfected security interest from being taken for public use without just compensation. United States v. Security Indus. Bank, 459 U.S. 70, 81, 103 S.Ct. 407, 414, 74 L.Ed.2d 235 (1982); Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589–90, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935). The Heldor Indus. court concluded that:

> There is no satisfactory basis for arguing that although Code [§§ 361, 362(d)(1), 363(e) & 364(d)] provide that a secured creditor must be compensated if the bankruptcy case causes a reduction in the value of collateral, the creditor does not have to be compensated if the state takes the creditor's money to pay for an environmental cleanup. The real property in question is neither owned by the Bank nor its collateral, and the state simply cannot take the Bank's money to pay for a cleanup merely because the

were removed by federal agencies, therefore mooting the appeal. The Seventh Circuit ordered the appeal remanded to the district court and the bankruptcy court for vacatur. Judge Ihlenfeldt's order states:

> IT IS ORDERED that the September 22, 1989 decision and order of this court is vacated and set aside as moot insofar as it pertains to whether or not the trustee is required to expend funds subject to a perfected secured interest to dispose of hazardous wastes generated and illegally stored by the trustee in his operation of the debtor's facility.

Although Judge Ihlenfeldt was compelled to partially vacate the order in the Better-Brite deci-

Bank has the misfortune to be in the same case.

131 B.R. at 586.

As in Heldor Indus. and T.P. Long, remedying any pollution on the Premises will provide absolutely no benefit to the Bank, which has no interest whatsoever in the allegedly contaminated real estate. A secured creditor is not the insurer of every risk generated by its collateral. T.P. Long, 45 B.R. at 288. Additionally, if this court were to allow a surcharge of the personal property collateral proceeds to clean up hazardous materials, it would, in effect, be taking funds directly from the Bank for arguably public use without just compensation.

■ Therefore, even assuming Dock's Corner had standing to seek a § 506(c) surcharge, costs of compliance with environmental statutes applicable to real estate may not be surcharged against the personal property collateral of the Bank under § 506(c).[31]

## V. CONCLUSION

Based on the discussion above, this court holds:

1. The Debtor and Dock's Corner do not have a rentor-rentee relationship as required by N.J.Stat.Ann. §§ 2A:44–165 and 2A:44–166. Therefore, Dock's Corner does not have a valid landlord's lien against the personal property stored at the Premises, including the proceeds from the sale of the Bank's collateral. Even if a rentor-rentee relationship existed between the Debtor and Dock's Corner, the landlord's lien would be avoided pursuant to 11 U.S.C. § 545(3) and (4).

sion, this court finds his analysis, made while the issue was still ripe, is extremely persuasive.

**31.** Notwithstanding the court's holding that Dock's Corner does not have standing pursuant to § 506(c) and, even if it did, the costs of clean up under environmental statutes may not be surcharged against the Bank's personal property collateral, the Trustee may seek to surcharge the Bank for any postpetition use and possession allowed chapter 7 administrative claim. See L. KING, COLLIER ON BANKRUPTCY ¶ 506.06, at 506–56.

2. Dock's Corner is entitled to a chapter 7 administrative expense priority for postpetition use and possession of the Premises to store property of the estate pursuant to § 503(b)(1)(A). Genuine issues of material fact exist regarding the amount of the administrative expense.

3. Genuine issues of material fact now exist regarding the estate's liability for compliance with state and federal environmental statutes.

4. Assuming the estate has liability for environmental pollution, genuine issues of material fact exist regarding any chapter 7 administrative expense for costs of compliance with federal and state environmental statutes pursuant to § 503(b)(1)(A).

5. Dock's Corner does not have independent standing to surcharge the personal property collateral of the Bank pursuant to § 506(c). Even if Dock's Corner had standing, a surcharge would not be allowed regarding alleged pollution to the real property because the Bank did not receive a benefit as required by the statute. With regard to Dock's Corner's chapter 7 administrative claim for use and possession of the Premises, which will be determined by this court, the Trustee may determine whether to seek to surcharge the Bank.

Partial summary judgment is granted to the Trustee and Bank respecting the invalidity of Dock's Corner's asserted landlord's lien and respecting Dock's Corner's lack of standing to surcharge pursuant to § 506(c). Partial summary judgment is granted to Dock's Corner allowing an administrative claim for postpetition use and possession of the Premises. Since genuine issues of material fact exist regarding the amount of Dock's Corner's administrative expense, the liability of the Debtor or Trustee for compliance with environmental statutes, and the priority for costs of compliance with environmental statutes, a trial will be scheduled so the court may decide these issues. An order shall be entered accordingly.